UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| **ANTHONY BACKHURST**, an individual, and **ANGEL CRUZ**, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> **LEE COUNTY**, a political subdivision of the State of Florida, <br><br> Defendant. | CIVIL ACTION <br><br> Case No. 2:18-cv-061 <br><br> Judge: Unassigned <br><br> Mag. Judge: Carol Mirando |

**PLAINTIFFS' REPLY ON PLAINTIFF'S OPPOSED MOTION TO AMEND COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

**NOW COME** the Plaintiffs, by and through undersigned counsel, respectfully file their Reply and, state as follows:

**MEMORANDUM OF LAW**

**A. The Requirements of Rule 16 are Met.**

Rule 16 states that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The Court may enlarge a period of time and permit an untimely filing where the omission is a result of excusable neglect. Fed. R. Civ. P. 6(b)(1)(B); *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 n. 2 (11th Cir. 1998)); *see also Auto-Owners Ins. Co. v. Ace Elec. Serv., Inc.*, 648 F. Supp. 2d 1371, 1375 (M.D. Fla. 2009). "To determine if the neglect was excusable, a court must look to the danger of prejudice to the nonmovant, the length of the delay and its impact on the proceedings, and the reason for the delay including whether the movant acted in good faith and whether the delay was within the reasonable control of the movant." *Succullo v. United States*, No. 8:16-cv-410-T-36TBM, 2017 U.S. Dist. LEXIS 218954, at *21, 120 A.F.T.R.2d

1

(RIA) 6943 (M.D. Fla. June 5, 2017). But the ultimate determinative factor for the Court to consider is whether good cause exists for the delay in moving to amend. *See Beauregard v. Continental Tire North America, Inc.*, No. 3:08-cv-37-J-32HTS, 2009 U.S. Dist. LEXIS 18096, 2009 WL 464998, at *2 (M.D. Fla. Feb. 24, 2009).

Here, the requirements of Rule 16 are met. In the Defendant's Response (Doc. 29), the Defendant takes roughly six (6) pages in purporting to summarize what led to the filing of the Plaintiff's Motion to Amend (Doc. 26). But what defense counsel rather conveniently glosses over is the fact that she was sent a copy of the proposed Second Amended Complaint on April 10, 2017, some 17-days *prior* to the deadline to amend, and then failed to respond to undersigned counsel for more than 2-weeks. (*See* Ex. 1). But undersigned counsel did not just sit idly by when defense counsel failed to respond, instead reaching out to her again on April 25, 2018. (*See* Ex. 2). Only then did defense counsel finally respond by return email on April 26, 2018, later that day sending a second email finally indicating, *for the very first time*, that the Defendant opposed the proposed Second Amended Complaint, which she was sent a copy of back on April 10, 2018. (*See* Ex. 3). Undersigned counsel then responded later that afternoon:

> Based on the length of time between when I first sent you the draft motion and today, would you agree to a two week in large meant [sic][1] to file the motion to amend? I do not intend to file a formal motion for extension but I would like confirmation that you will not oppose a motion to amend within two weeks as being untimely, since the deadline is formally tomorrow.

(*See* Ex. 4). Counsel for the Defendant has never responded to that email.

As can be seen, good cause exists to extend the deadline to amend given the fact that the Plaintiff sent the Defendant a copy of the proposed Second Amended Complaint 17-days before the deadline to amend. Moreover, excusable neglect exists because the delay that caused the Plaintiff to not move

---

[1]  As the email was sent from undersigned counsel's iPhone using the dictation feature, blame for the typo should be shared equally with Siri. Regardless, it should be clear that the word "enlargement" was intended.

to amend within the deadline is more directly attributable to Defense counsel's dilatory conduct. Had she simply responded to undersigned counsel in a timelier manner, the motion to amend would have been filed on or before April 27, 2018.

Allowing the Second Amended Complaint to be filed would not prejudice the Defendant in the least. The proposed Second amended Complaint is the same draft complaint that the Defendant was sent 17-days prior to the deadline. Additionally, the Plaintiffs' actual motion to amend was filed merely 2-business days after the deadline. Moreover, the amendment does not change the scope of the case as no new claims are being added, but rather only specificity is added to the existing factual allegations. And finally, allowing the proposed Second Amended Complaint will have no prejudicial effect on discovery, which has only just begun.[2] Indeed, discovery in this case is not slated to close until March 11, 2019 and the trial is presently on the October 2019 trial term. (*See* Doc. 23). Consequently, the Plaintiffs' Motion to Amend ought to be deemed timely.

**B. FCA Retaliation Claims Need Not Allege the Defendant Submitted a False Claim.**

The crux of the Defendant's opposition to the Plaintiffs' proposed Second Amended Complaint is that it purportedly does not establish a nexus between the Plaintiffs' complaints and federal funds. But the United States Supreme Court has made clear that "a well-pleaded retaliation complaint need not allege that the defendant submitted a false claim." *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson,* 545 U.S. 409, 416, 125 S. Ct. 2444, 2449 (2005). As the Supreme Court has made clear, this does not mean that at the time the employee engaged in the investigative conduct there had to be a reasonable possibility that he would prevail on an FCA claim, for an employee can prevail on a retaliation claim even if the facts ultimately make it impossible for any underlying FCA claim to succeed. *Id*. at 416 (stating that section 3730(h) "protects an employee's conduct even if the target of an investigation or action to be filed was innocent"); *id*. at

---

[2] The Defendant has not served any written discovery, nor has it taken any depositions or served subpoenas.

416 n.1 ("[P]roving a violation of § 3729 is not an element of a § 3730(h) cause of action.").

Instead, the employee only must have reasonably *believed* their investigative acts could lead to a viable FCA claim. *United States ex rel. Yesudian v. Howard University*, 332 U.S. App. D.C. 56, 153 F.3d 731 (D.C. Cir. 1998).[3] The FCA's legislative history confirms that this test mirrors what Congress intended. Thus, the statute itself imposes no requirement--indeed, it includes no suggestion--that an employee's underlying FCA claim must be even remotely viable to support a retaliation claim. Requiring anything more would--without any basis in the statute--often leave employees unprotected even when they acted in good faith to prevent fraud against the government. Such a result would directly contravene the FCA's goal of "encourag[ing] any individual knowing of Government fraud to bring that information forward." S. REP. NO. 99-345, at 2, reprinted in 1986 U.S.C.C.A.N. at 5267.

The Court ought to keep in mind that nearly all employees who investigate and bring fraud claims are laypeople, not lawyers. Expecting laypeople to know with any degree of certainty whether their employers' actions violate the FCA's often vague provisions is simply unrealistic, especially when courts themselves disagree over what constitutes a viable FCA claim.[4] Thus, when deciding whether a plaintiff's beliefs were reasonable, a court should put itself in the layperson's shoes, for "[t]here is no suggestion in the [FCA's] legislative history that Congress meant to extend protection only to lawyers, or to others only after they have consulted with lawyers." *Yesudian*, 153

---

[3] At least three other circuits have echoed the D.C. Circuit's focus on the reasonable belief standard. *See Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004) (*quoting Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002)); *accord Wilkins v. St. Louis Housing Auth.*, 314 F.3d 927, 933 (8th Cir. 2002).

[4] *Compare United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1201 (10th Cir. 2006) (holding that the term "obligation" in the FCA includes "instances in which a party is required to pay money to the government, but, at the time the obligation arises, the sum has not been precisely determined") *with United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 774 (8th Cir. 1997) ("[A]n obligation under the meaning of the False Claims Act[] must be for a fixed sum that is immediately due."). As the D.C. Circuit opined, in the analogous context of Title VII retaliation claims, "a layperson should not be burdened with the 'sometimes impossible task' of correctly anticipating how a given court will interpret a particular statute." *Parker v. Baltimore & Ohio R.R.*, 209 U.S. App. D.C. 215, 652 F.2d 1012, 1020 (D.C. Cir. 1981) (*quoting Berg v. La Crosse Cooler Co.*, 612 F.2d 1041, 1045 (7th Cir. 1980)).

F.3d at 741 (holding that, because there is no requirement that a plaintiff know his investigation could lead to an FCA claim, "there likewise can be no requirement that he suggest to defendant that he is contemplating such an action" and that defendant must merely know that the plaintiff is engaged in "activity that reasonably could lead to a False Claims Act case").[5] Importantly, "protected conduct" is to be interpreted broadly. *United States ex rel. Gobble v. Forest Labs., Inc.*, 729 F. Supp. 2d 446, 449 (D. Mass. 2010). The employee "need not have known that his actions could lead to a *qui tam* suit under the FCA, or even that a False Claims Act existed, in order to demonstrate that he engaged in protected conduct." *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 237 (1st Cir. 2004).

Given these considerations, it becomes even clearer that the Plaintiffs' beliefs were reasonable. As a prerequisite to receiving federal funds, counties and municipalities must identify what purpose those funds will be used for and any fraud being committed that could impact those funds plausibly gives rise to a possible violation of the FCA. To that point, if Lee County employees conspired with private vendors to commit the fraud alleged in the proposed Second Amended Complaint, federal dollars very well could have been fraudulently obtained by the private vendors. And that could give rise to an FCA claim in two possible ways: (1) if the private vendors fraudulently obtained federal dollars by way of Lee County,[6] and (2) if Lee County allowed the federal dollars to be fraudulently

---

[5] *See also McCrary v. Knox Cty.*, 200 F. Supp. 3d 782, 786 (S.D. Ind. 2016), holding for a FCA claim, it is sufficient to allege that a claim was made to a grantee that receives a majority of funding from the federal government, and that under circumstances in which an entity receives a majority of its funding from the federal government, it might be true that a claim to a grantee is effectively a claim to the United States, and therefore the FCA will apply when a false claim is made to that entity. As we are at what is really the motion to dismiss stage, the Plaintiffs' allegations plausibly connect their good faith belief and reporting that federal funds were being fraudulently obtained to their terminations, thus giving rise to an FCA retaliation claim.

[6] I.e. a possible *qui tam* versus the private vendors.

5

obtained by the private vendors.[7] Either way, it is reasonable for an employee to believe a violation of the FCA could exist given the federal funds not going to their intended purpose and their reporting of the same is due to be protected under §3730 for "a well-pleaded retaliation complaint need not allege that the defendant submitted a false claim." *Graham*, 545 U.S. at 416.

In the Second Amended Complaint, the Plaintiffs allege that they "disclosed to the investigator that the Defendant… was unaware of or condoning fraud committed against it that resulted in public monies being fraudulently obtained by private parties through false claims." (¶27). The Plaintiffs further allege that the Defendant receives "approximately $153,706,847 in grants from federal and state agencies, of which approximately $1.3 million was appropriated to Public Safety (which includes animal services programs)" (¶70) and that the "Defendant's employees engaging in illegal bid-rigging and allowing best-rate fraud to be committed, all of which could have impacted federal funds by virtue of Lee County obtaining such federal funds and then not using them for their proper purpose, in addition to the federal funds being misappropriated." (¶71). The Plaintiffs allege to have used words like "committing fraud," "false claims" and "misappropriated." (*See* ¶¶27, 71, 79). Such words are sufficient to allege that Defendant was on notice that Plaintiffs were conducting or had completed an investigation that could lead to FCA litigation. *United States ex rel. Sharp v. E. Okla. Orthopedic Ctr.*, No. 05-CV-572-TCK-TLW, 2009 U.S. Dist. LEXIS 15988, at *83-84 (N.D. Okla. Feb. 27, 2009).[8] Consequently, the proposed Second Amended Complaint states a retaliation claim.

---

[7] I.e. a possible *qui tam* versus both the private vendors and Lee County, who could be complicit in the scheme. "[W]hen a defendant submits a claim, it impliedly certifies compliance with all conditions of payment. But if the claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement . . . the defendant has made a misrepresentation that renders the claim 'false or fraudulent' under § 3729(a)(1)(A)." *Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1995 (2016).

[8] *See also Mendiondo v. Centinela Hosp. Medical Center*, 521 F.3d 1097, 1104 (9th Cir. 2008)(complaints to employer that company was possibly committing "civil and criminal violations… although vague, … can be construed to include the suspected Medicare fraud" and thus her employer was "informed of her protected activity.").

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order granting the instant Plaintiffs' Motion to Amend, direct the Clerk to file the Plaintiff's attached Second Amended Complaint and all other relief the Court deems just and proper.

Respectfully submitted,

Dated: May 24, 2018

**s/ Benjamin H. Yormak**
Benjamin H. Yormak
Florida Bar Number 71272
Trial Counsel for Plaintiffs
YORMAK EMPLOYMENT & DISABILITY LAW
9990 Coconut Road
Bonita Springs, Florida 34135
Telephone: (239) 985-9691
Fax: (239) 288-2534
Email: byormak@yormaklaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2018, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: None.

*/s/ Benjamin H. Yormak*
Benjamin H. Yormak